20 So.2d 214

### MUTUAL LIFE INS. CO. OF NEW YORK v. BRUNSON.
### 4 Div. 347.

Supreme Court of Alabama.

Dec. 14, 1944.

Douglas Arant and Ellene Winn, both of
Birmingham, J. M. Rowe, of Montgomery;

and Bradley, Baldwin, All & White, of Birmingham, for appellant.

J. C. Fleming, of Elba, for appellee.

236

FOSTER, Justice.

This suit was begun at law by appellee, by his next friend, claiming disability benefits under a policy of life insurance on his own life. Plaintiff had caused his mother to be named the beneficiary after the death of the beneficiary first named. Plaintiff's disability claim was on account of his alleged insanity, which he claims existed when he designated his mother as beneficiary, and therefore that the designation was void. His mother was named in the action as his next friend.

On account of default in the payment of a premium, which later occurred, and pursuant to the terms of the policy, and with the consent of the plaintiff, the company made an endorsement on the policy to the effect that it should operate as term insurance for six years and one hundred and forty-six days as non-participating paid up insurance without double indemnity or disability payments.

The trial court ordered a transfer to equity without either party filing petition to do so. Thereupon plaintiff filed a bill in equity with a different next friend, and with his mother as a respondent. She is not contesting it. In it he seeks a cancellation of the designation of his mother as beneficiary, and a cancellation of the endorsement changing the beneficiary and converting the policy to term insurance, and a personal judgment in his own favor for the disability benefits. The insurer demurred and that demurrer was overruled. It is now assigned as error, also the order removing the cause to equity.

The disability benefits by reason of insanity were payable to his mother if the designation of her as beneficiary is valid; but to him if it is invalid on account of his insanity. So that in his suit at law, he could show the invalidity of the designation (see, Metropolitan Life Ins. Co. v. Bramlett, 224 Ala. 473, 140 So. 752), and thereby recover the benefits if there are any, payable under the policy, and a cancellation of it in equity would not be necessary.

The bill seeks not only a cancellation of such designation but also of the endorsement for the term insurance. The endorsement designating the policy as term insurance resulted from a failure to pay the premium due March 29, 1931. The plaintiff claims that at that time he was insane and totally disabled from pursuing a gainful occupation on account of such insanity, of which he had furnished the necessary proof.

The equity of the bill, if it has equity, is to cancel the designation of his mother as beneficiary and the endorsement on the policy making it term insurance. A court of equity will generally exercise its jurisdiction to cancel a contract made by an insane person when there is no adequate remedy at law available. White v. Hale, 234 Ala. 385, 175 So. 288; Cox v. Parker, 212 Ala. 35, 101 So. 657; 12 C.J.S., Cancellation of Instruments, § 26, p. 975.

He cannot ordinarily pursue an equitable remedy for that purpose unless his remedy at law is inadequate. National Life & Accident Ins. Co. v. Propst, 219 Ala. 437, 122 So. 656; Pacific Mut. Life Ins. Co. v. Strange, 226 Ala. 98, 145 So. 425; All States Life Ins. Co. v. Jaudon, 230 Ala. 593, 162 So. 668; Citizens Ins. Co. v. Mathis, 233 Ala. 146, 170 So. 481; American Life Ins. Co. v. Stewart, 300 U.S. 203, 57 S.Ct. 377, 81 L.Ed. 605, 111 A.L.R. 1268.

But in such cases "the issue is not one of jurisdiction but of the need and propriety of equitable relief." Atlas Life Ins. Co. v. W. I. Southern, Inc., 306 U.S. 563, 59 S. Ct. 657, 661 (12–15), 83 L.Ed. 987.

With respect to the designation of his mother as beneficiary, plaintiff did have a right in his suit at law, by showing his mental incapacity at that time, to make such designation and thereby defeat its effect so as to enable him to be entitled to recover the disability benefits in his own name and at law.

But there was no ground of demurrer taking the point that the remedy at law is adequate in that respect.

■ But the bill seeks also a cancellation of the endorsement on the policy making it term insurance, and his recovery in an action at law would not have the effect ipso facto of cancelling that endorsement, whereas if it is the result of his mental incapacity he has the equitable right to have the endorsement cancelled, and the policy restored to its original status.

In fact the decree of the court overruling the demurrer recites the fact that "respondent concedes in argument that if insured was insane during the entire period for which he claims disability, he can state a cause for equitable relief." We believe that he has stated such a cause for equitable relief insofar as it seeks a cancellation of the endorsement upon the policy changing its tenor as above indicated, and the demurrer for want of equity was properly overruled.

We need not inquire definitely whether the failure of the respondent to demur to the bill on the ground that the plaintiff had an adequate remedy at law insofar as his right to cancel the designation of the beneficiary is concerned, is sufficient to justify a court of equity in exercising its jurisdiction to cancel such an instrument when there is in existence an adequate remedy at law.

■ The other grounds of demurrer do not seem to need discussion. There was no reversible error in transferring the cause to equity by the judge under authority of section 151, Title 13, Code.

The cause went to trial on the issue of total and permanent insanity. The evidence was taken by deposition, resulting in a decree granting full relief to complainant.

The policy bore date of issue, March 29, 1928. The premium was payable semi-annually on the 29th of September and March thereafter. The payments were met through March 29, 1930. The beneficiary named in the policy was J. (James) C. Brunson, father of the insured. It contained a disability clause, not now reciting other stipulations, that, "if before attaining the age of sixty years and while no premium on this policy is in default, the insured shall furnish to the company due proof that he is totally and permanently disabled, as defined above, the company will grant" the benefits.

Total disability is defined as "any impairment of mind or body which continuously renders it impossible for the insured to follow a gainful occupation." Permanent disability is thus defined: "Total disability shall during its continuance be presumed to be permanent, (a) if such disability is the result of conditions which render it reasonably certain that such disability will continue during the remaining lifetime of the insured, or (b) if such disability has existed continuously for ninety days."

As of the date of October 3, 1930, insured made a verified statement of claim for disability benefits for an illness stated to exist from April 1st to that date because of auto-intoxication. It was supported by an affidavit of Dr. E. T. Brunson that insured was diagnosed by him as having "auto-intoxication, mild nephritis, mental derangement," beginning in April 1930, "but should recover." Also an affidavit of Dr. Randolph, an alienist, of Jacksonville, Florida, to the effect that insured "first consulted me July 15th, 1930: History of having been ill for several weeks preceding, consequent upon an attack or seizure in the nature of a heat stroke following exposure on a fishing trip; illness being characterized by,—headache; fever (?), confusion; and general physical and mental disability. At time of consulting me there was slight elevation of temperature Bradycardia; exaggerated reflexes; and vasa-motor instability; mild memory defect and some lack of insight. Blood and spinal fluid tests negative. Stool showed infection of Uncinaria. (Ankylestemiasis.) Physical findings, giving dates and full details: Under direct care and treatment for 6–8 weeks; and has been reporting at intervals since; making steady improvement after about first fortnight; and is today practically discharged as 'cured,' and dismissed from further treatment except for mild thyroid medication in an effort to slightly reduce weight."

Insurer thereupon paid insured the benefits for four months ending October 10th, and waived the premium due September 29, 1930. Insured did not thereafter receive treatment for such trouble nor consult a physician concerning it until 1936, when he had another breakdown.

There was default in the payment of the premium due March 29, 1931, whereby insured became entitled to certain option rights, which he failed to exercise. The company on July 20, 1931, wrote insured and requested him to send the policy for endorsement to indicate that thereafter for a designated period it would continue as

paid-up, non-participating term insurance without double indemnity or disability payments as provided in it. Insured complied by writing a letter and sending the policy. On August 3, 1931, that endorsement was made and the policy returned to him, which he retained without objection. On May 26, 1933, his father, who had been named as beneficiary, died. On December 12, 1934, insured signed a designation of his mother as the changed beneficiary, which he sent to the company with the policy, and the company endorsed such change on it and sent it back to insured. Except for the change of beneficiary, supra, there seems to have been no communication between them concerning this policy until insured's attorney wrote insurer in 1938 making claim for benefits under the original proof claiming that the disability was total even after October, 1930, and was permanent and continuous. But in the meantime, he made several unsuccessful applications to defendant for other insurance on his life.

■ Under the terms of the policy proof of disability must be furnished the company while no premium is in default. This requirement is imperative. Equitable Life Assur. Soc. v. Hill, 230 Ala. 505, 161 So. 800; McCutchen v. All States Life Ins. Co., 229 Ala. 616, 158 So. 729; All States Life Ins. Co. v. Steward, 242 Ala. 258, 5 So.2d 784. Insanity of insured does not excuse him from complying with that condition. McCutchen v. All States Life Ins. Co., supra.

■ The proof which insured submitted in support of his claim, consisting in part of the affidavit of Dr. Randolph, showed that as of October 14, 1930, insured was "discharged as cured and dismissed from further treatment," except a minor ailment. If insured was then still totally disabled notwithstanding such affidavit, the proof then made did not so indicate. Therefore, this was not sufficient to require continued benefit payments, nor a waiver of subsequent premium payments. And on November 7, 1930, insured wrote plaintiff in substance that for further benefits further proof would be necessary. There was no response to this letter, and there has been no further proof made. And no further premium payments have been made.

■ But appellee insists that the proof showed a total disability which continued for ninety days, and therefore that it was presumably permanent thereafter under the policy defining permanent disability, although total disability had in fact then terminated. But that construction of it does violence to its plain terms. They are that if the total disability shall continue for ninety days, it will be presumed that during its continuance it is permanent. It does not say that if it continues ninety days it is presumed to be permanent thereafter, though it is not then a total disability. The evident purpose is to eliminate the necessity of proving permanency to enable insured to get benefits if he is totally disabled for ninety days successively and makes the proper proof, though he is then not permanently so. The reason being that the benefits are not payable if the total disability is merely temporary and not permanent; but it will be presumed to be permanent while the total disability continues, if it continues for ninety days. But here the proof of the claim showed that the total disability had terminated at that time. So there was no presumption that total disability was permanent thereafter resulting from that proof. Triplett v. Equitable Life Assur. Soc., 117 W.Va. 537, 186 S.E. 124. To have that effect the proof submitted with the claim should show that the total disability still existed as of that date. See Eubank v. New York Life Ins. Co., 66 Ga. App. 209, 17 S.E.2d 591. When default occurred in paying the premium due March 29th, delinquent April 29, 1931, there was no proof with the insurer as required by the policy that insured was then permanently and totally disabled, actually or presumably. The proof which was made in October 1930 gave no indication of the continuance of total disability extending to the period of the March 1931 premium payment.

There has been a controversy among the cases of whether the presumption of permanency on account of the continuance of total disability for ninety days is a conclusive or a rebuttable presumption as affecting the right to recover benefits during the continuance of the total disability. That is to say, whether such benefits are recoverable if the total disability continues ninety days, but the insured recovers in whole or in part by the time the claim is made, so as to rebut the existence of permanency in fact. The cases holding contrary views on that subject are annotated and digested in 110 A.L.R. 631, et seq.

But in the instant suit that controversy is not presented. The insured made payment of benefits for the period of time

when the proof showed that total disability continued which was more than ninety days, although such proof showed also that it no longer existed. There seem to be no cases in the books which construe such a clause to mean that because the total disability continued ninety days it was presumed therefore thereafter to be permanent, though in fact it was not permanent. But the contrary is expressly held in Erreca v. Western States Life Ins. Co., 19 Cal.2d 388, 121 P.2d 689, 141 A.L.R. 68.

 In the instant case not only did the proof of the claim made under the policy show that total disability had terminated, but we will undertake to show that it had in fact terminated and that thereafter for at least six years he was only partially disabled, at most.

There is no contention nor phase of the evidence which shows any marked degree of change for the better or worse after he was discharged by Dr. Randolph, an alienist, of Jacksonville, Florida, as of October 14, 1930, until his breakdown in 1936. None of his family at the time questioned the opinion of Dr. Randolph that he was completely recovered. His family thought so evidently in permitting him to make the proof and collect for the benefits, when if he were still incompetent, the father was due to do so and collect them. Thereafter he was taken into the family businesses, served in them at their instance; and served as a member of the town council by election. All for gain. They now say that this was true, notwithstanding he was to their knowledge still mentally incompetent to pursue a gainful occupation and without any notice to the company by any of them of the existence of his disability, whereby benefits would have been payable then.

If he was totally disabled by reason of his mental condition during all that period, it looks like some of them, especially his father, and later his mother named as beneficiary, and his brother who was his partner in business, would have caused the necessary proof to be made to cash in on the claim, and not have waited for eight years without doing so. Such was their duty under the policy. See McCutchen v. All States Life Ins. Co., supra. Complainant introduced the depositions of Dr. Kay of the Alabama Bryce Hospital, who testified as follows:

"I first saw Joseph C. Brunson, examined and treated him on August 17, 1938, at which time he was insane.

"To the fourth interrogatory he saith: I have no way of definitely estimating the length of time Joseph C. Brunson has been insane. I had never seen him nor had the occasion to observe him at any time prior to his admittance to the hospital on August 17, 1938.

"To the fifth interrogatory he saith: Joseph C. Brunson was here from August 17, 1938, to January 11, 1939. He came back on March 21, 1939, and stayed until August 1, 1939, when he went out again, returned December 12, 1939, and is here now. He has always since August 17, 1938, been a patient of the Bryce Hospital, part of the time he was merely on furlough. In my opinion the disease from which he is suffering is uncurable."

And Dr. Partlow testified as follows:

"Joseph C. Brunson has been continually a patient of the Bryce Hospital, which is one of the Alabama State Hospitals, since the date of his admission August 17, 1938, except for two short periods out on Parole or furlough from January 11, 1939, to March 21, 1939, and from August 1, 1939, to December 12, 1939. He continues a patient at the Bryce Hospital. After sufficient examination and observation his case was diagnosed as dementia praecox, paranoid type, which is usually considered incurable and an unfavorable mental condition. He is in good physical condition, but there has been no material change in his mental condition. Joseph C. Brunson was admitted to the Bryce Hospital on August 17, 1938, he having been committed from Coffee County, Alabama, by the Judge of Probate of that county.

"To the fourth interrogatory he saith: It is my opinion that Joseph C. Brunson is permanently insane in that he will continue unreasonable, inadjustable and mentally irresponsible throughout his life. He was insane when he entered the institution in my opinion and has continued insane all the time since that date.

"To the fifth interrogatory he saith: It is my opinion that Joseph C. Brunson was insane at the time of his admission August 17, 1938. I had no way of determining how long he had been in this condition, however."

Dr. E. T. Brunson, a general practitioner, and a relative of insured, testified as to his condition in 1930, as follows:

"I recall first that he was having some mental derangement, associating his delusions and hallucinations in connection with a school teacher that was in Samson at the time and I remember that he was just all wrong about his reasoning and he even got to where he felt like they were dragging her through town in an ambulance and he was under the impression that she had died, but any way he was having a lot of delusions about this girl. There wasn't any reason for association between him and this girl whatever; it was just a mental condition that existed and nothing to cause him to have all those delusions that he was having.

"(Q) Now what mental disease did he suffer from, Doctor, at that time? (A) Well, at that time it was hard to tell. All that I knew was that he was having a marked mental disease, and he was certainly having delusions of various kinds and possibly some hallucinations. His whole line of thought and reasoning was more or less at random and he didn't seem to have any straight line of thought, or reason and the only thing I knew at that time was that he was having a mental disturbance, or a mental depression, or a mental derangement. I couldn't classify his mental disturbance at the time."

And as to his condition after his return from Jacksonville, Dr. Brunson testified as follows:

"(Q) What has been his mental condition from that time until now, Doctor? Has there been any change? That is, has he gotten any better, grown worse, or just what happened to him? (A) He has been wrong all the time. There have been periods when he apparently was about normal, but there has been something that you could detect abnormal in him all the while.

"(Q) Well, Doctor, since October, 1930, from your observation and seeing him do you know and have you diagnosed what mental disease Joseph C. Brunson has? (A) I didn't make any diagnosis in his case, but I understand that one has been made, but it was made at the asylum.

"(Q) You didn't make any diagnosis in his case, but you understand that one has been made at the asylum. (A) Yes, sir.

"(Q) Well, in your judgment, what mental disease is he suffering with from what you have seen of him? (A) Well, I think the diagnosis made is correct. He is diagnosed as dementia praecox. * * *

"(A) There have been times, I say, when he was so nearly normal that an average individual would think he would be able to do anything that he had done previously, but I don't think he would be competent to do it.

"(Q) But you don't think he would be competent to do it, do you? (A) No, sir.

"(Q) As to a business transaction, he wouldn't understand the results of it, would he? (A) No, sir; I don't think so. * * *

"(Q) There was a period of time when Mr. Brunson returned from the sanitarium, or hospital, where he was in Jacksonville, Florida, in the early part of 1930, there was a period of several years when he carried on various daily activities, much the same as he did when he was normal, didn't he? (A) Yes, sir; he went where he wanted to and did what he pleased."

Defendant offered the deposition of Dr. Randolph, who testified as to his professional experience as follows: "One year Shepherd Pratt Hospital, Baltimore, Md. (hospital for nervous and mental diseases); six years Florida State Hospital for Insane, Chattahoochee, Florida. Since 1910 private practice devoted exclusively to nervous and mental diseases." And that insured was under his observation for two or three months in 1930, and again in 1936 from June 24, to July 4, but did not treat him in 1936, and gave no deposition about him as of that time; and he testified further in substance as set out in his affidavit heretofore referred to, and as follows:

"My treatment of him in 1930 consisted of elimination of the hookworm; regulation of rest, exercise, and diet; in addition to tonics, sodium cacodylate for restoration of nerves, and glandular tablets for building up generally. * * *

"Good, and restored to normal as of the 14th of October, 1930.

"That he was not permanently and totally disabled from following a gainful occupation."

Defendant also offered depositions of Dr. Willcox of Jacksonville, Florida, whose practice was limited to internal medicine, but who examined insured on September 15, 1930, at the instance of defendant. But his examination and testimony seem to be of little value on the issue now at hand.

The question for us to determine is whether insured recovered from his breakdown in 1930, and could thereafter substantially perform the material duties of some gainful occupation for which he was qualified. Mutual Life Ins. Co. v. Danley, 242 Ala. 80, 5 So.2d 743; Mutual Ben. Health & Accident Ass'n v. Bain, 242 Ala. 471, 6 So.2d 599.

The fact that he had during that time in fact performed the material duties of a gainful occupation is very persuasive that he had the capacity to do so to a substantial degree. See the discussion in New York Life Ins. Co. v. Torrance, 224 Ala. 614, 141 So. 547; Id., 228 Ala. 286, 153 So. 463.

But if he received compensation for work which he did not perform or which he performed in a way which did not justify the compensation which he received or any other substantial sum, it cannot be said that he was substantially performing the material duties of a gainful occupation. Or if he had not the physical or mental ability to carry on a gainful occupation in its substantial features with skill and accuracy, which such business required in the usual and customary manner, his attempt to do so for compensation and his continuing effort at it is not conclusive that he was not totally disabled. Torrance case, supra, 228 Ala. 286, 153 So. 463; Protective Life Ins. Co. v. Hale, 230 Ala. 323, 161 So. 248; Mutual Life Ins. Co. v. Danley, supra.

Insured's activities in the business and political life of his town up to 1936, in connection with all the other evidence, are such that the proper inference is that he had the mental capacity to earn a living in the pursuit of an occupation for which he was qualified by experience and training; and to do it in the usual and customary way. He evidently had bad judgment at time in respect to certain transactions, but that is a relative term. Whose judgment is perfect all the time?

The decree of the circuit court in equity is reversed, and one here rendered denying relief and dismissing the cause.

Reversed and rendered.

GARDNER, C. J., and THOMAS and STAKELY, JJ., concur.