29 So.2d 233

## METROPOLITAN LIFE INS. CO. v. ALSTON.

6 Div. 476.

Supreme Court of Alabama.

Feb. 6, 1947.

Rehearing Denied March 6, 1947.

McQueen & McQueen and Foster, Rice, Madison & Rosenfeld, all of Tuscaloosa, for appellant.

Wright, McFarland & McGuire and Reuben H. Wright, all of Tuscaloosa, for appellee.

FOSTER, Justice.

The question in this case is whether appellee, suing appellant, became totally disabled as the result of disease so as to be prevented thereby from engaging in any business or occupation, and performing any work for compensation or profit beginning prior to the anniversary date of said policy nearest to the sixtieth birthday of insured.

The evidence showed that his sixtieth birthday was May 21, 1944; and that the anniversary date of his policy nearest that date was January 28, 1944.

On February 21, 1944, insured suffered a critical attack of coronary thrombosis while on his way after lunch walking from his residence to a bank in Tuscaloosa, of which he was chairman of the board and real executive head. He was immediately placed under the treatment of his physician, Dr.

Shamblin, who called to his aid Dr. Wiesel. He remained under an oxygen tent for several weeks, and in bed for six or seven months. There were other doctors who administered to him, but those were the only doctors who testified. They agreed that from and after February 21, 1944, when he had that attack he was totally and permanently disabled as a result of disease from engaging in any business or occupation or performing any work for compensation.

The question of fact on which depends the right to benefits arising during the continuance of disability is whether such disability occurred prior to January 28, 1944, the anniversary date of the policy nearest May 21, 1944, the date of his sixtieth birthday.

Dr. Shamblin, his family physician and residing next door to insured, testified in substance that he began treating insured for that ailment in March 1943, and saw him about once a week until July 1st, when he began to visit him on call about twice a week, until his attack in February 1944. He had pains in his chest radiating to his stomach, which indicated that the stage was being set for coronary thrombosis, which is a progressive disease, gradually getting worse. This began in March 1943. By July 1943, in his judgment, insured had become totally and permanently disabled, and he so advised insured, and told him that he ought not to work any more; that it would be injurious to his heart, and would give him serious trouble if he did not quit work. He further testified that by July 1, 1943, he showed clearly and plainly that he had coronary thrombosis, which is a total and permanent disability, and if he did any work it jeopardized his health or life. As to the attack on February 21, 1944, the witness testified:

"That may be a little hard to explain in my terms, but the cause of coronary thrombosis is the closing up of an artery to the wall of the heart, and what happened on that particular occasion was a complete closure. That gave him his fever and his high blood count and the drop in the sedimentation test, and the blood vessel was completely closed up. Until that time, it was a partial closure, which was giving him predominant symptoms of coronary throm-

bosis. The blood vessel was gradually closing up, and finally on February 21 it made a complete closure and no blood could get through to that part of the heart and that circulation was cut off and that part of heart just dies. That is what gave him the fever; and, then, nature has to heal that over and put scar tissue in place of muscle tissue at that point.

"As the blood goes through the heart, the heart doesn't get any nourishment from that blood. After leaving the heart, another blood vessel comes off from the big blood vessel leaving the heart and comes back and presses back like the fingers of your hand, and one of these arteries closed up and that gives you coronary thrombosis and it gradually closes up.

"The artery gets smaller and smaller until finally it completely closes and that part of the heart muscle this artery nourishes dies. That dead muscle is what creates the fever and blood count there against the wall of the heart. So, the sedimentation test drops down due to this thrombosis, or cutting off of the circulation to the heart.

"The hole in the other arteries—the same reason that causes this artery to close up causes the closing up or narrowing of the hole in the other arteries. That is the theory that the heart doesn't get the proper amount of nourishment in the blood due to the opening of these other arteries that do not close up; and, somewhat the same thing that makes this one close up has the same effect on the others."

Insured testified that he had been chairman of the board since 1935, and had extensive real estate interests. That he first noticed illness coming in early 1943, and consulted Dr. Shamblin constantly: he took soda after each meal; had pains in the upper stomach around the heart. Dr. Shamblin gave him prescriptions from time to time; and insured would frequently call him at night to get relief, two or three times a week: it was very painful. He was highly nervous and in bad shape all through 1943. His duties as chairman of the board were advisory, except that he presided over directors' meetings once a month: his son was vice-chairman, and they advised with each other; that in 1943 he

usually went to the bank between nine and ten o'clock, and went to lunch at twelve or twelve thirty, and sometimes returned in the afternoon, but not often: while there he performed his duties as chairman, although Dr. Shamblin had advised him not to do so. He did not do as much work as formerly, and it was generally in the nature of advice about buying bonds. Claims for disability benefits were prepared by Dr. Wiesel, and he signed them while under the oxygen tent. They give date of February 21, 1944, when he first became totally disabled. He received his salary after July 1943, as before, and it continued while he was still confined to his bed, and has been increased.

The evidence for defendant by the bank officers and employees was that during 1943, he attended generally to his duties as chairman of the board. Being the chief executive officer, he did as he thought desirable, and there was no difference in the work he did at the bank during 1943 from what he did before; but that during that time he was not so well, his feet would swell and he wore slippers at times in his office. In early 1943, he turned over to his son the management of all his real estate, which was very extensive. This was done on account of his health. In September 1944, insured filed with defendant another proof showing that his total disability began July 1, 1943.

No question is here raised as to the sufficiency of the proofs of the claim to comply with the policy. But in the proofs first filed it is stated the total disability began on February 21, 1944. This is taken as an admission against interest for what it is worth in determining whether total disability began prior to January 28, 1944. Those admissions are to be taken in connection with the explanation of them made by insured.

The legal principles pertaining to the main contentions on appeal are settled by this Court without controversy. Those contentions are that the affirmative charge was due appellant on the question of whether total disability began prior to January 28, 1944, or, in the alternative, whether the evidence was of such nature that the verdict should have been set aside on motion to the extent of finding that the total disability did begin on July 1, 1943.

Our cases applying total disability clauses similar in material respects to that now under consideration have held that they mean that such total disability exists when, and only when, the insured cannot substantially perform the material duties of some occupation for which he is qualified by experience and training. Mutual Life Ins. Co. v. Danley, 242 Ala. 80, 5 So.2d 743; Protective Life Ins. Co. v. Hale, 230 Ala. 323, 161 So. 248; New York Life Ins. Co. v. Torrance, 224 Ala. 614, 141 So. 547; Mutual Benefit Health & Accident Ass'n v. Bain, 242 Ala. 471, 6 So.2d 599; Mutual Life Ins. Co. v. Brunson, 246 Ala. 233, (12 and 13), 20 So.2d 214.

And it was held in New York Life Ins. Co. v. Torrance, supra, [224 Ala. 614, 141 So. 552], that if he in fact performs the material acts necessary to the prosecution of his profession in substantially his customary and usual manner, for which he is compensated, he is not totally disabled. And further that if insured continues "uninterruptedly in the performance of the substantial and material acts of his business or profession in the usual and customary way. To say that one who so performs the duties of his business is wholly disabled, is a contradiction in terms. The rule of common care and prudence has only been applied to those cases where insured has made effort and performed only some of the duties, more or less imperfectly, though suffering from serious accident or disease, and in answer to argument that such partial performance is conclusive against total disability. * * * and was never intended to conflict with or run counter to the other rule that where an insured is able to, and does, continuously perform all the substantial and material acts of his business, he is not totally disabled."

On the second appeal of the Torrance case, 228 Ala. 286, 153 So. 463, 464, additional evidence was offered by plaintiff to the effect that his work, that of a surgeon, was done under great mental and physical strain, and so inefficiently as to cause his practice to fall away because

such work could not be performed in substantially his customary and usual manner. We held that it could not be said as a matter of law that if his work, though attempted, was not performed in substantially his customary and usual manner, his attempt to carry it on was conclusive that he was not totally disabled, and left it to the jury, and we said: "If his physical or mental condition was such that his attempt to engage in an occupation was not accompanied with the ability to do so in its substantial features with the skill and accuracy which such business demands, in the usual and customary manner, he is totally disqualified from pursuing that occupation, though he does undertake to carry it on, but, in doing so, such want of skill and ability are manifest." This principle was approved in Equitable Life Assurance Society v. Dorriety, 229 Ala. 352, 157 So. 59; Protective Life Ins. Co. v. Hale, 230 Ala. 323, 161 So. 248; United States Casualty Co. v. Perryman, 203 Ala. 212, 82 So. 462.

It does not appear that he might have engaged in some other occupation. But the contention is made that he not only attempted to but did pursue his occupation as chairman of the board of the bank; and that he did it in substantially all its material features, as required of him, and in his usual and customary manner, and that if it be conceded that doing so was dangerous to his health and life, that does not affect the legal effect of the circumstance that he had the physical ability to do such work in his usually efficient manner, for he in fact did that very thing.

■ We do not think the definition of "total disabilty," which we have quoted means that if insured is engaged in several occupations and gives up one because of his disability, but is able to carry on one of them, and does so in his customary and efficient manner, he is totally disabled. For if he is able to pursue any gainful occupation in substantial and material respects in the usual and customary manner, he is not totally disabled. So that the fact that on account of his health insured gave up the management of his extensive real estate interests is not conclusive that he was not able to carry on as chairman of the board.

■ There is evidence tending to show (see, page 203 of record) that he was at one time vice-president of the bank, and then later made chairman of the board. It seems that he was never president, but R. H. Cochrane has been president for a long time. He was as vice-president active in making loans and such things, which he continued after being made chairman of the board about 1935, until July 1943 (page 206 of record) when his services became advisory except as chairman he presided at board meetings, all of which he attended in 1943 (page 196 of record). It does not appear that what he did after July 1943 was not a full and more or less perfect performance of the *duties required by the directors for which he was paid $700 per month*. It does not appear that he was not relieved of the duty of making loans and such things, if in fact they were ever a part of the services required to be rendered as chairman of the board. It does not appear what were his duties from time to time as set out in the by-laws and minutes of the board. If he was relieved of some of the services he formerly rendered as vice-president, or if by usage they were shifted to other officers and he was not expected to render them as chairman of the board, but performed such services as the board expected of him as such officer, and did it in his usually efficient manner, it cannot be said that he was totally disabled from engaging in that occupation. If he had attempted to do so, and found that his health prevented him from doing it in his usually efficient manner, but in such way as was not satisfactory and up to his standard of service, a different result may follow. Mutual Life Ins. Co. v. Brunson, supra (13).

But no one questions that during the whole of the time up to February 21, 1944, the services which he actually rendered for the board were as efficient as ever, and that he received his salary for such services as before. It is doubtless true that prudence demanded that he desist in July 1943, as his doctor advised him. But he did not heed that advice and continued to work as well as chairman of the board as before.

676

On the record as it now appears, the affirmative charge was erroneously refused appellant.

Reversed and remanded.

GARDNER, C. J., and LAWSON and STAKELY, JJ., concur.