114 So.2d 277

**PAN COASTAL LIFE INSURANCE COMPANY,**

v.

**Roy MALONE.**

8 Div. 242.

Court of Appeals of Alabama.

May 19, 1959.

Rehearing Denied June 9, 1959.

Scott, Dawson & McGinty, Scottsboro, for appellant.

Andy Hamlet, Jr., Scottsboro, for appellee.

PRICE, Judge.

This is an appeal from a judgment below in favor of the plaintiff. The cause was submitted on the merits and on motion by appellee to dismiss the appeal and affirm the decision of the lower court because of the lateness of the filing of the transcript.

We find no merit in appellee's motion, since we have examined the record and find the transcript of the evidence was timely filed in the lower court and the record was filed in this court on the sixtieth day from the date the transcript of the evidence was filed in the lower court. The motion is denied.

On the merits

This is a suit by Roy Malone against Pan Coastal Life Insurance Company, a Corporation, to recover on two health and accident policies in which the appellant insured the plaintiff "against loss resulting solely from bodily injuries sustained during the term of this policy effected directly and independently of all other causes through accidental means." The complaint consisted of two counts, which will appear in the report of the case.

The complaint was not demurrable for failure to aver the term of the policy, the period covered thereby, that the loss sued for occurred within the period for which the policy was issued; that the policy coverage extended to or through the time for which compensation is sought. Life Ins. Co. of Virginia v. Hanback, 250 Ala. 643, 35 So.2d 696; Inter-Ocean Casualty Co. v. Anderson, 245 Ala. 534, 17 So.2d 766; American Bankers' Ins. Co. v. Dean, 227 Ala. 387, 150 So. 333; Sovereign Camp, W. O. W. v. Gunn, 224 Ala. 444, 140 So. 410; American Bankers' Ins. Co. v. O'Neal, 25 Ala.App. 559, 150 So. 562.

The plaintiff, Roy Malone, testified that on December 12, 1955, he was involved in an accident while hauling a load of wood with a pair of mules and a wagon. One of the wheels hung. on a tree, causing him to fall between the mules while his left foot was still hung in the wagon. When his foot was released he became sick at. his stomach and his foot and leg began to swell and pain him and he lay beside the wagon until he felt better and then was assisted into the wagon by Henry Martin. Mr. Martin was seriously ill at time of trial and did not appear to testify in the case. On the same

day plaintiff went to see Dr. Willis Sanderson, who dressed the leg where it was hurt, between the knee and foot. He saw the doctor regularly thereafter. He was unable to walk without the aid of crutches.

The plaintiff further testified that he was a farmer, a veterinarian and also traded mules. From the date of the accident until July 1, 1956, he was unable to carry out the duties of his occupation and unable to do any other kind of work.

The plaintiff introduced in evidence two health and accident policies, identified as exhibit 1, policy No. AH-7535, and exhibit 2, policy No. AH-7528. He testified the defendant had paid $726 on the two policies, compensation through March 30, 1956, but failed and refused to pay compensation for April, May and June.

The plaintiff testified on cross examination that he went to see Dr. Sanderson regularly, but kept no record of his visits. On the day of the accident he used a pair of homemade crutches to get to the doctor's office and the doctor loaned him a new pair of crutches to go home on. A part of the duties pertaining to his occupation as a veterinarian consisted of giving shots with a hypodermic needle to hogs; treating cows for bloat; sewing up a pig that had been stepped on by its mother; giving mules shots; pouring something from a bottle down a sick mule; lancing a sow's foot. He stated he went to Luther Millican's and gave a sick sow a penicillium shot; that he guessed he went to Johnny Bailey's house and ran a piece of water hose down a bloated cow's throat; that he sewed up a hole in a pig, which Mr. Bailey brought to his house; that he didn't know whether he did these things after the accident. He thought it was after July 1st that he went to see a sick mule belonging to S. C. Rooks; that he did not treat a sick cow for Mr. Rooks between the time of the accident and July 1st, but did treat one not long before the trial; that Mr. Grady Sims brought a dog to his place for treatment but he couldn't remember the date; that he did not remember

lancing an infected foot on Mr. Sim's hog; that a part of his duties in trading mules is catching them and showing them to people, but he did not catch mules and bring them out of the barn to show them to Mr. Brown.

Dr. Willis Sanderson testified he treated plaintiff at his office on December 12, 1955; that he had an excoriation of the skin, which means a severe abrasion. The excoriation was about two inches in diameter and he had a large hematoma and swelling of the midshaft of the left lower leg. A hematoma is a blood clot underneath the skin. It is caused by a blood vessel having been broken and the blood backs up and makes a pool under the skin. The doctor testified he applied a dressing and administered drugs. He next saw Mr. Malone on December 16. At that time he had a large hematoma. It was the same clot but it had become larger in size. He drained the blood clot and inserted a rubber drainage tube. He saw plaintiff again on December 19 and redressed his leg and gave him more drugs; that he saw him again on December 23 and his leg seemed to be improving. He saw him again on January 9, 1956, at which time he had developed a thrombophlebitis or blood clot in the same lower leg. This blood clot was in a vein that goes straight down the back of the leg; that at that time he applied an elastic stocking and gave him an antibiotic. He saw him again on January 16, at which time the leg was swollen, but the blood clot was under control. Dr. Sanderson testified that during the entire time he was treating him plaintiff had a very tender left ankle, which pained him when he walked on it, and witness recommended X-rays. The X-rays showed no broken bones or fractures. On January 20 he placed Mr. Malone's leg in a walking cast. On February 10, he repaired the cast and noticed the toes were still swollen. On March 2nd he removed the cast and applied an elastic stocking. On March 8 he made an appointment for plaintiff with Dr. Killefer, of Chattanooga. Dr. Killefer is an Orthopedist, a specialist in the diseases of the bone, joints and muscles. Witness saw

plaintiff again on April 3, April 20, and May 10th. He was still on crutches and his condition was unimproved. On June 3rd his condition was still unimproved. No treatment was given on that occasion. Dr. Sanderson was on vacation and away from the office during the entire month of July. On August 2nd his condition was still unchanged. The doctor stated he was familiar with the duties of a farmer and of a veterinarian and that in March, April, May and June of 1956 Mr. Malone was on crutches and, "I don't see how he could carry out the usual duties of a farmer if he was on crutches", and "I don't know and don't see how a man, if he is a veterinarian, how he could carry out the duties of a veterinarian and be on crutches."

On cross examination Dr. Sanderson testified the second time he saw plaintiff was December 16, and the next was December 19, when the drain was removed. Since the transcript of his testimony before a court reporter prior to trial shows that he answered "no" to the question: "q. This thrombophlebitis was not the result of the injury?", he apparently made such statement, but he doesn't know why he would have said a thing like that. He remembered stating to defense counsel, either before the court reporter or on a different occasion, that thrombophlebitis very often occurred from an injury and also from surgery. If he were asked if thrombophlebitis could be the result of an injury he would definitely say "yes".

He saw plaintiff four times in January. By January 16th there was nothing wrong with his leg as a result of the injury, as far as the naked eye could reveal. When he first examined Mr. Malone he found nothing wrong with the ankle, but as the skinned place and the incision made to remove the blood clot healed he began to complain of pain in his ankle. He could find nothing about his injuries to cause pain or injury to his ankle. In order to determine if there was something wrong with the ankle he had X-rays made of the leg from the knee down. Upon examination of the X-rays he could find nothing wrong and he sent them to a specialist who reported he found nothing wrong with the bony structure. The cast was put on the leg for pain and tenderness of the ankle, and all he knew about pain and tenderness was what Mr. Malone told him. He stated he told plaintiff on more than one occasion that he couldn't find anything wrong with his leg to cause the pain. From March 8 through July Mr. Malone was still under his care and observation, but was receiving no treatment. He knew Mr. Malone needed treatment, but he was not able to offer the treatment that was necessary and all he could do was to observe him. He said there is something definitely wrong with the leg, but he was not able to say what it was. The plaintiff's left leg was much cooler than the right leg which indicated a defective or faulty circulation and that it could be very painful to walk on it without crutches.

For the defendant, one Luther Millican testified that between December 12, 1955, and July 1, 1956, he lived a neighbor to plaintiff; that plaintiff came to his house and fixed a shot in a needle for a sick hog; that witness and his son caught the hog, and he didn't remember who gave the shot. The next day Dr. Malone fixed a shot and gave it to the boy to give to the hog.

Mr. Levi Millican testified that in the spring of 1956, some people caught one of his hogs for him and Mr. Malone put a shot in the hog. He further testified the plaintiff was on crutches at that time.

Mr. Johnnie Bailey testified plaintiff told him, or instructed him how to treat a cow and fixed some medicine and Mr. Bailey gave the medicine to the cow.

Mr. S. C. Rooks testified plaintiff was on his place in the fall of 1955, but that plaintiff had not been to his place in the spring of 1956.

Mr. Grady Sims testified the plaintiff was at his place during the spring of 1956, and lanced a sow's foot, and that plaintiff was on crutches at the time. Witness caught the hog and Mr. Malone stuck a knife in its

foot. About the same time he gave him some pills to give to a sick dog.

Mr. E. D. Brown testified he bought a mule from the plaintiff in the spring of 1956.

The first insistence made by appellant is that it was entitled to the general affirmative charge for the reason the evidence fails to show due proof of loss as provided in the policy.

■ There may be an express or implied waiver by the insurer of proof of loss, and an insurer's denial of liability on grounds other than failure to furnish proofs of loss operates as a waiver of notice or proof. Shears v. All States Life Ins. Co., 242 Ala. 249, 5 So.2d 808; Travelers' Ins. Co. v. Plaster, 210 Ala. 607, 98 So. 909.

In 45 C.J.S. Insurance § 1004, pp. 1229, 1230, the rule in respect to waiver of notice or proof of loss is thus stated: "Where the company performs some act which constitutes a recognition of its liability under the policy, as where the company attempts to settle or adjust the claim, or pays or offers to pay part or all of the loss under the policy, any defects or irregularities in the notice or proofs of loss are waived thereby."

■ The effective date of each policy is October 1, 1955. The initial premium on each policy was $11.50, with monthly renewal premium of $5.50. Plaintiff testified he had paid the premiums on policy No. AH-7535, "up to date." As to policy No. AH-7528, he said "That is another insurance policy I was paying on." This evidence was uncontroverted. Appellant insists it was entitled to the general affirmative charge for failure of proof that the claimed disability arose before default in payment of premiums.

In Pilot Life Ins. Co. of Greensboro, N. C. v. Hawkins, 222 Ala. 218, 131 So. 889, 890, the court said "the insurer has the burden of showing nonpayment of subsequent premiums after issue and delivery of policy, and the introduction of the policy makes out a prima facie case", see also United Ben. Life Ins. Co. v. Dopson, 232 Ala. 625, 169 So. 287.

It is next insisted that the court erred in overruling defendant's motion to exclude the evidence offered by the plaintiff and direct a verdict in favor of defendant on the grounds that plaintiff failed to show that his injuries were sustained during the terms of said policies effected directly and independently of all other causes through accidental means, and on the further ground that plaintiff failed to show that the injuries upon which he based his claim wholly and continuously disabled and prevented the insured from performing any and every kind of duty pertaining to his occupation.

Each policy contains the following provision:

"The Pan Coastal Life Insurance Company, Mobile, Alabama, does hereby insure the person whose name appears in the schedule on the first page hereof (hereinafter called the insured), subject to all of the conditions, provisions and limitations hereinafter contained, against loss resulting solely from bodily injuries sustained during the term of this policy effected directly and independently of all other causes through accidental means, hereinafter referred to as 'such injuries' * * * (a) if 'such injuries' shall, within twenty days from the date of the accident wholly and continuously disable and prevent the insured from performing any and every kind of duty pertaining to his occupation, the company will pay monthly indemnity at the rate specified in the schedule, for the period of such continuous total disability, but not exceeding twelve consecutive months.

After the payment of Monthly Indemnity for twelve months as aforesaid, the Company will continue the payment of Monthly Indemnity at the same rate thereafter for a period not exceeding forty-eight consecutive months, during which the Insured shall be wholly and continuously disabled by

'such injuries' from engaging in any occupation or employment for wage or profit."

■ The term "total disability" is not used in a sense of "absolute helplessness", Jefferson Standard Life Ins. Co. v. Simpson, 228 Ala. 146, 153 So. 198.

"The result of our many decisions, therefore, is the true rule that total disability within the meaning of the policies here involved means inability to substantially perform the duties of any substantially gainful occupation for which he is qualified by training, education or experience. The proper test is not whether an insured can do all or substantially all of the things he previously did in following a gainful occupation, but whether or not the insured can substantially perform the material duties of some occupation for which he is qualified." Mutual Life Ins. Co. of New York v. Danley, 242 Ala. 80, 5 So.2d 743, 747; Protective Life Ins. Co. v. Hale, 230 Ala. 323, 161 So. 248; Metropolitan Life Ins. Co. v. Alston, 248 Ala. 671, 29 So.2d 233.

■ " 'The term "total disability" is a relative term, depending in a measure upon the character of the occupation and the capabilities of the insured, and to a large extent upon the circumstances of the particular case. Ordinarily it is a question of fact, and not of law.' Travelers' Ins. Co. v. Plaster, 210 Ala. 607, 98 So. 909, 911; United States Casualty Co. v. Perryman, 203 Ala. 212, 82 So. 462, 464." New York Life Ins. Co. v. Torrance, 224 Ala. 614, 141 So. 547, 550.

■ Whether or not plaintiff's injuries were sustained within the terms of the policy "effected directly and independently of all other causes through accidental means" and whether or not he was "wholly and continuously disabled" during the time alleged in the complaint, were, under the applicable rules of law, questions for the jury's consideration.

The court committed no error in overruling defendant's motion to exclude plaintiff's evidence and direct a verdict in favor of defendant.

■ It is insisted that highly prejudicial and ineradicable argument of plaintiff's attorney to the jury entitled defendant to a mistrial. The record shows the following:

"Mr. Foster: You are not going to let this rich insurance company, or broke insurance company, or some kind of insurance company—

"Mr. Dawson: We object to that, and ask for a mistrial.

"Mr. Foster: I withdraw my statement about the rich insurance company—

"The Court: Just a minute. Gentlemen of the Jury, that is improper argument to refer to the standing or welfare of either party. That is improper argument, and it is not to be considered by you. It would be very wrong for you to consider it.

"Mr. Dawson: We ask for a mistrial.

"The Court: I sustain the objection, but overrule the motion. I believe what I have said is sufficient. If I didn't think it was, and that you wouldn't be guided by what I say, that it would be very highly improper for you to regard the statement of the attorney—if I didn't believe you gentlemen are intelligent enough to disregard it, I would here and now immediately declare a mistrial. I believe I can say that you will, and that you must do it.

"Mr. Dawson: We want to object to the ruling of the Court. We think the argument is highly improper.

"The Court: I overrule the motion.

"Mr. Foster: I apologize about the well off insurance company—

"Mr. Dawson: We object to him going over it again.

"Mr. Foster: I am apologizing."

In Life & Casualty Ins. Co. v. Cain, 217 Ala. 301, 116 So. 154, 155, counsel's argument referred to life insurance companies as "the richest people in this country." The court said:

"The statement by counsel was improper, but not so highly improper as to be beyond

**332**

the cure of the court's instruction that it was improper and should not be considered by the jury."

We are of opinion that the ruling and instructions of the trial court were sufficient to remove any harmful effect from the argument of plaintiff's attorney, and denial of motion for mistrial was without error.

Exception was reserved to this portion of the court's oral charge:

"Gentlemen, our Supreme Court of this State has given us a definition of the meaning of total disability, what total disability means. What does it mean? Within the meaning of an insurance policy the term total disability means, inability to substantially perform the duties of any substantially gainful occupation for which insured is qualified by training, education or experience. The Supreme Court goes further and says that the proper test is not whether insured can do all or substantially all things he previously did in following a gainful occupation, but whether he can substantially perform the material duties of some occupation for which he is qualified. If he can not, he would be totally disabled under the law as our Supreme Court has last defined it.

"It don't mean, of course, that for a man to be totally disabled, that he is helpless and can't do anything. If it comes within the definition I have given you, he is totally disabled within the meaning of the law as it has been given to us by our Supreme Court."

The above quoted definition is in substance that laid down by the Supreme Court in Mutual Life Ins. Co. of New York v. Danley, supra, and Protective Life Insurance Company v. Hale, supra.

■ It is insisted that the verdict of the jury is contrary to the great weight and preponderance of the evidence. After allowing all reasonable presumptions of the correctness of the jury's verdict, we can-

not say it was contrary to the great weight of the evidence. Clark v. Hudson, 265 Ala. 630, 93 So.2d 138. The presumption in favor of the correctness is strengthened when the trial court refuses to grant a new trial. Smith v. Lawson, 264 Ala. 389, 88 So.2d 322. Clark v. Hudson, supra.

The judgment is affirmed.